Please be seated, ladies and gentlemen. As you can tell, Judge Rovner is joining us by a video hookup. We will begin with the first argument of the day. Luis Segovia and others against the Plaintiffs. This case involves the arbitrary allocation of the fundamental right to vote within a politically powerless group. The central issue is whether Congress or the states can extend absentee voting rights to nearly all U.S. citizens who move outside of the states but withhold those rights from those who move to certain U.S. territories but not others. Although we believe Mr. Wyatt, if tomorrow, tomorrow, Illinois changed its laws to prohibit absentee voting by residents in the Northern Mariana Islands and American Samoa, would that resolve this case? I don't believe it would, Your Honor, for two reasons. One is that there would still be an obligation under federal law to extend the right to vote in the Northern Marianas. So that law would be preempted as suggested. If, on the other hand, both the federal government and the state of Illinois enacted a law along the lines that you mentioned, our position is that that also would violate protection. That's not this case. This court doesn't need to decide that case. But our view is that once the vote is extended nearly worldwide to citizens who've lost their vote by virtue of moving out of their state of residence, it should be extended to the people who move to the territories as well. Does Illinois have to offer absentee balloting? Does Illinois have to offer an absentee ballot? Under federal law, I believe there are certain requirements to offer absentee ballots. Whether the federal law, in the absence of federal law, would you have to offer absentee voting? Perhaps not. But our position is that once... Does the Constitution require it or is it just federal statute? I don't know. We've said the Constitution does not require absentee ballots at all. Correct. I don't believe that there's a voting. But in this case, our position is once the absentee voting has been extended, it has to treat, the law has to treat similarly situated individuals similarly unless there's a justification not to do so. And there is no such justification here. I want to address these laws first off under the rational basis framework because I think that it can be resolved and should be resolved on that ground without deciding whether a fundamental right is at stake or whether a suspect class is at issue. The framework doesn't set the bar high, we acknowledge, but it does set a bar. A law has to be rational. It cannot be arbitrary. It can't be irrational. I don't think anyone would dispute that a law that extended overseas voting rights to people whose last names start with A through M but not N through Z would be unconstitutional. Similarly, Justice Stevens said in City of Cleveland versus Cleveland Living Centers in a concurrence, you couldn't limit the franchise on the basis of height or weight either because it has no bearing at all on the citizen's willingness or ability to exercise that civil right. The same is true here. We're dealing with a similar type of law. We've extended the right to vote to people in certain territories but not others, but that difference in residence has nothing to do with those citizens' willingness or ability to exercise those voting rights. Now, it's undisputed looking at the legislative history that there's no explanation for drawing the lines the way that the lines have been drawn. We think that's a red flag even if it's not conclusive under rational basis review where you're allowed to consider other possible justifications. It's significant because the federal and the state laws at issue draw the lines in different places. The federal law says you can vote in the Northern Mariana Islands. Illinois says there and American Samoa, based supposedly on the same underlying federal justification. Turning to the justifications that have been offered in this case for the laws, I want to start out with a threshold point that all of these justifications are based on what Congress might have thought in 1986, 31 years ago. We submit that a law has to be justified under current conditions. The Supreme Court said exactly that in Shelby County v. Holder, which we cite in our brief, that current burdens have to be justified by current needs. That should be the case here as well. It's a real problem here that citizens of these territories do not have the right to vote in presidential elections, period. Courts have long held that denying the right to vote for president, vice president to U.S. citizens living in the territories does not violate the Constitution. And the fact that these citizens formerly had the right in Illinois, how does that change that? Judge Rovner, that's correct. And to rule for us, no violence needs to be done to that precedent. Our position is not that there is a fundamental right to vote in the first instance under the Constitution in the territories. Our argument is that once legislatures have undertaken to extend absentee voting rights and treat people who live in France, who live in the Northern Mariana Islands, who live in American Samoa, as though they still lived in Illinois. And by the way, the legislative history to the 1975 Federal Act says it's doing exactly that. It's expanding the bona fide residency concept to treat those people as though they still live in Illinois. If them, why not the residents of Puerto Rico, Guam, and the Virgin Islands who previously lived in Illinois? What is different about them? And that's where we get back to the rational basis justifications that have been offered here. They don't make sense. So we've been told, for example, that the uniqueness justification is little more than a justification that we can treat people differently because they're different. It's not an explanation for different people. I thought it had more of a recognition, simply that there are unique histories and political histories and political compromises and arrangements worked out with each of the respective territories. For example, we've got under immigration law, statutes that treat each of those territories differently. We've got the Northern Mariana Islands contract working out in great detail the various rights. So why isn't it, in essence, rational to simply respect the fact that these are unique, one-of-a-kind, custom-tailored deals with each territory? That's correct, Your Honor. Each territory is different, and they have different avenues. There may or may not be a legitimate government interest in treating them differently any way you want to based on that different history, but there still has to be a rational relationship between that interest and the law at issue. And here, there really is no relationship between allowing a former Illinois resident to vote in the Northern Mariana Islands and the unique history of the Northern Mariana Islands. And the attempt to explain this in the prior briefing highlights this point because we're told, for example, the Northern Mariana Islands is more a foreign country. Well, more like a foreign country than what? The covenant says that federal law will be a general application in Northern Marianas as long as it was applicable to the states and Guam, which signifies an intent to treat Northern Mariana Islands just like Guam, like another territory, not like a foreign country, not different than Guam. Mr. Wyatt, tell me this. If an ex-felon moves from Illinois, where she is permitted to vote, to Florida, where she is not permitted to vote, is that an infringement on her right to travel? What is that? How does that factor into your argument? So the Supreme Court has said that no, that denying the right to vote based on ex-felon status is not unconstitutional. So that sort of trips up that hypothetical a little bit, but getting to the point that I think you're getting at, no, it wouldn't because Illinois, in that case, is not extending absentee voting rights to people who move to Florida. People who move to Florida take up residence there, and because they have national representation in Florida, the law, neither Congress nor Illinois thought it necessary to extend absentee voting rights for former Illinois residents. That may sort of raise its own set of issues, but I think it's distinct from what we're dealing with here. And what about the fact that individual citizens have no constitutional right to vote for electors for the president, and a state could simply select the electors itself? Well, actually, you're, yes. Does that argument that individuals have a fundamental right to vote for president? I think, actually, Your Honor, that's a very good point within the context of the fundamental right argument that we're making. There is no, it's been argued, I think, the core disagreement really between the parties on the fundamental right point is, is there a fundamental right to vote when the Constitution doesn't expressly grant it to you? It doesn't expressly grant it to territorial residents. We acknowledge that. But it doesn't expressly grant the right to vote for president either, as you just pointed out, and yet no one would dispute, I hope, that the right to vote for president, once extended to the citizens, is of a fundamental nature, and arbitrary lines, or even non-arbitrary lines, cannot be drawn within the electorate once that vote is extended. I don't know if that answers your question, but that's our position on the fundamental right point, which I'll elaborate in just a minute, but I just want to close the rational basis point by addressing this argument that it would create a distinction of unfairness within the territories to extend voting rights there. I have a couple of points on this. Number one is that distinction already exists in two of the territories by virtue of the state and federal laws here. Former Illinois residents can vote in American Samoa and Northern Mariana Islands. Lifetime residents there cannot. It makes no sense to argue that the same distinction would be sort of uniquely unfair to extend to the other three territories. The other thing is that this argument is in some tension with the defendant's other argument that incremental expansion of voting rights is fine. This is what this would be, an incremental expansion by allowing some people, not everyone, but some people residing in those three territories to vote. And the final point I would say on this is I don't think it's evident that this would be a distinction of questionable fairness. I think people in Puerto Rico, in these territories, would prefer to have some voice in national representation as opposed to zero, which is the current situation, and the evidence for this is the governor of Puerto Rico intervened in the Romeo versus Cohen case on which the defendants to argue on behalf of the plaintiff who wanted to be able to vote for precedent from Puerto Rico, not on behalf of the defendants on the ground that it would create some kind of unfairness. Could you address the, at least what I understood to be the rationale of the First and Second Circuits, that the rationale here that is that overseas citizens in foreign countries without absentee ballots from their state of residence cannot vote in any U.S. elections, whereas residents of American territories at least have the right to vote where they live? That's right, Your Honor, and two things to say in response to that. Number one is those cases are slightly different in an important way because they're not dealing with the fact that within the territories people are being treated differently. So that issue just isn't addressed by those cases, but to your point... That's a separate issue. We'll get to that. But to your point, we disagree with the rationale of those decisions because fundamentally territorial residents who used to live in the states are in really a worse position than people living in France or Germany as it respects the ability and need to influence federal voting. Congress said we should extend the right to vote to overseas citizens because they have interests that are both unique to living overseas and in common with the people that they used to live among in Illinois or wherever else in the United States, all the more so with territorial residents. They live under federal law every single day. They depend on federal largesse to help them out of hurricane relief situations, things of that nature. They are at least, and frankly much more so, in need of federal representation. The delegates and the resident commissioner that they send to Congress have no voting power. They have no votes to trade, no influence. Right. And this gets to one of my concerns that your suspect class argument really points in the direction of asserting a constitutional right to vote on the part of all residents of U.S. territories, doesn't it? Well, I think that that's certainly a possible implication of a suspect class treatment. We would argue that... That's a problem. Well, we would argue the court doesn't need to go that far at all. Tell me, no, but we do need to have at least a rational stopping place. Correct. And that rational stopping place would seem to reside with the constitutional power that Congress exercises over territories, right? Correct. But let me just say two things on that note. Number one is Congress has power on the territory clause. The states do not. And this would not be the first place where a court makes a distinction. The Supreme Court has made a distinction at the level of scrutiny that applies to classifications based on alienage, depending on whether Congress or the states enact it. Congress gets a free hand, basically, rational basis review. States are subject to strict scrutiny. So even if that's a basis for insulating the federal law from review, it gives the state no pass to treat people differently. That's number one. And number two is we don't think that the suspect class argument needs to be taken to its logical end. There are intermediate levels of suspectness. For example, in Plyler v. Doe, the Supreme Court said, we have a class of migrant children who are excluded from public school. There's no right to education. They're not a suspect class. But under the Equal Protection Clause, in this unique situation where these two things intersect, we feel that heightened scrutiny is required. Here, what we have is a law that further insulates people who are excluded from the political process by saying, if only you had moved to these other two favorite territories. If we could go back, though. So one of your arguments then would seem to be satisfied if Illinois just cut out these rights for people in American Samoa, right? The argument that the state is discriminating in a way that the federal government is not. Well, this sort of gets to the remedy question, and our position would be the correct one. That's part of it. Yes. But your rationale, the argument you just made, was that we should consider more strictly state restrictions or classifications based on residence, territorialism, and so on, than national distinctions. Well, our primary position is that both should be subject to scrutiny because of the unique intersection here of sort of political powerlessness and as it's being sort of affected by this law. But you're correct that the secondary argument would refer to the state specifically, and if the federal law were upheld, one thing that Illinois could do to bring itself into conformance with it would be to mirror federal law. It doesn't do that, and in light of the fact that it doesn't do that, we think the appropriate remedy would be to require it to expand the vote, not just to American Samoa. Who should make that decision? Well, that is a decision that this court can and should make. Generally, the rule for remedies where there's an equal protection clause violation is expansion rather than nullification, and in this case... Where do you get that principle, particularly in light of the Supreme Court's most recent decision on alien... Sessions versus Morales, cited in the 28th jail letter earlier this week, yes. Yes. That case says the ordinary rule is expansion. So what it said, though, was where you have a situation where the Congress's, you look to the legislative history or Congress's intent, however you discern it, you determine its main purpose. Is this consistent with the main purpose or not? The remedy that's like guesswork, because with most legislation, we assume that there are compromises struck. Well... And it's very difficult sometimes, at least, to know if the compromise struck is deemed unconstitutional, do we go for more or less? Your Honor, I think that's probably presented every time the court has to consider whether expansion or nullification is required, and the courts just have to make that choice. And with that backdrop, they do try, courts do try, to discern what Congress or the states would have wanted if faced with the question, rather than just throwing it back to the legislature. And those cases say that where the intent is predominantly, as it is in this case, expansion of the right. The legislative history is that from top to bottom. Let's expand it worldwide. There's no discussion of excluding the territories or a need to exclude the territories or what purpose that would serve. So this is not a situation like the one in the case just decided by the Supreme Court, where the prevailing congressional view was, we need longer term residence to be certain that you have some adherence or affiliation with the United States. This exception that was... You know, basically what you just said, I think, the purpose of UCAVA is to expand and not contract voting rights. That's correct. That's what you just basically said? Yes. Well, UCAVA would not prohibit Illinois from changing its laws to prohibit absentee votings by residents in the northern Mariana Islands and American Samoa, would it? It does not prohibit Illinois from doing that. But it does create a baseline that has discrimination within the territories built in. And it leaves it to the state whether to fix that problem by building on it or not. And we don't think that that's appropriate. And it doesn't insulate either law from review. Just quickly on the fundamental rights issue. The argument here has been framed in terms of, as I mentioned before, whether the Constitution grants a right, but also in terms of whether you're a resident or a non-resident. And I would just point again to the purpose of Congress in enacting the 1975 law. It's very explicit in the legislative history. This is an expansion of the bona fide residence concept. We are going to treat people who used to live in these states, but now no longer have representation in national government, as though they still live in those states. So the question of resident versus non-resident presented in the cases on which the defendants have relied, cases involving municipal elections, they just don't line up. Those cases involved expressly people who were non-residents of the municipality claiming some right because of how the laws of the municipality affected them, directly or indirectly. Here, we're dealing with people overseas who are similarly situated in the sense that they've lost their right to vote, they used to be from Illinois, and they're just treated differently based on where they moved to. And on that basis, we think their fundamental rights are being violated and that heightened scrutiny is appropriate. Thank you, Your Honors. Thank you, Mr. Wyatt. We'll hear from Pele's first, Ms. Zubrisky. May it please the Court, Carleen Zubrisky on behalf of the federal defendants. I'd like to make sure I reserve at least eight minutes of time for the state defendants in this case. With UCAVA, Congress expanded absentee voting to people who moved overseas. To do that, it had to draw a line between what would count as overseas and what would count within the United States. Congress didn't have to draw that line in the best possible place, so long as there was some conceivable rational reason for the place where it ultimately chose to draw that line. Congress reasonably decided that- You know, you argue that the plaintiffs lack standing vis-a-vis the federal government because their injury, if any, stems from the state law and not federal law. The plaintiffs argue that their disenfranchisement is directly traceable to discrimination in UCAVA as it is that law that requires So would you respond? Sure. Your Honor, UCAVA sets a floor for where states have to accept absentee ballots from, but in no way prevents states from accepting absentee ballots from people beyond sort of the floor that it sets. So in our view, the harm that they're really complaining about here, which is their inability to vote in Illinois elections for Illinois electors and Illinois representatives, is something that is caused, it's fairly traceable to the actions of a third party, which is the state of Illinois, in our view, to the extent that they have any standing here. If I may, you know, so we think that that's an independent reason that the claims against UCAVA should be dismissed, but even setting that aside, we also think that the lines drawn in UCAVA easily satisfy a rational basis. Dismissed against federal? Against the federal defense, is that right? The standing argument is only with respect. What about citizenship? Apologies? A citizen. Does everyone who votes elsewhere have to be a citizen? You know, I'm not aware of any sort of clear description of whether states would ever be, you know, permitted to allow a non-citizen to vote, if that's your question. It's sort of coming up right now. Some people who are as far as voting absentee, etc., most of the time, if somebody's in another country, you have to be a citizen. Yes, I mean, that's certainly true under UCAVA, and I believe that's true under the laws of every state, and, you know, the Constitution places sort of these various elections in the people of the states. And some people in those territories were not citizens, actually. That's true. Yes, that's all accurate, Your Honor, but, you know, I think that's a little bit, I think, the question that, that's at issue here. You know, I do want to keep... I'd like to follow up on my question, please. Is the federal law immune from review, simply because Illinois could adopt legislation that is more expansive and could correct the harm of the federal law? I don't think it's immune from review. I mean, there would need to be a proper Article 3 case or controversy for somebody to challenge it. And, again, we don't, we just don't think that the plaintiff's injury here is caused by the federal statute. The federal statute does not in any way prevent anyone anywhere from voting. And that's the crux of the argument that, you know, that's the crux of the injury that is being claimed in this case. You know, again, you know, just as when I moved from New York to the District of Columbia, I gave up my right to vote for senators and representatives in New York and instead obtained the rights to vote that attached in the District of Columbia. That's the same thing that happens when plaintiffs move from Illinois or any other state to a place like Puerto Rico. They obtain the right to vote for the non-voting delegates that represent Puerto Rico in Congress. And they, you know, give up the rights to vote that came from their previous place of resident. You know, the fact that this is not a fundamental- Are you basically saying that the rationale for treating the Northern Mariana Islands differently is that the federal government treats the Northern Mariana Islands differently? Can that be a rational basis for a law? Well, I think that it can to the extent that what we're saying is that the Northern Mariana Islands are different. It's a different jurisdiction with a dramatically different relationship with the United States and political history. You know, there are any number of reasons that Congress may just be less willing to interfere with anything that's going on in the Northern Mariana Islands. So give us one or two. Sure. I mean, so first of all, Congress might have simply wanted to extend absentee ballots only to the places where they felt that there was going to be the least ability of people to otherwise participate in sort of federal governance. And, you know, until 2008, certainly there were no representation in Congress whatsoever for the Northern Mariana Islands, which is in sharp contrast to the other territories, which for many decades have had non-voting delegates in Congress. You know, and even after that point, it's certainly possible that there are functions of local law or who could participate in elections that would mean that Congress was just, you know, less comfortable with the extent to which people would be able to participate from the Northern Mariana Islands. It could simply be less politically divisive in the Northern Mariana Islands to have this sort of distinction of questionable fairness, you know, that we've, you know, that we've discussed in the brief and that the Romo courts. Between lifelong residents and those who move from the mainland. Between people who, for instance, were born in Illinois and moved to Puerto Rico and people who have never left the island of Puerto Rico. You know, we think that that could really, it's perfectly reasonable. You know, plaintiffs have offered some theories about why, you know, they think that that would be more fair rather than less fair or, you know, the governor of Puerto Rico. But Congress could certainly have been concerned about that distinction when it was drawing this line for purposes of UCAVA. And again, as long as there was some rational basis for Congress's actions, you know, we think that the statute and the line drawing exercise that Congress was engaged in here needs to be affirmed. You know, Congress has always had an exercise, the power to legislate individually with respect to the various territories. They have really different governing structures, relationships, histories, local laws, legal systems, and Congress, as we pointed out in our brief, regularly does distinguish between them for any number of statutory purposes. You know, this is not sort of a monolithic group of entities. It was reasonable for Congress to do that here. If there are no further questions, we'd ask the court to affirm the decision of the district court. Oh, I'm sorry, one additional thing. I would really direct the court to the analysis in Holt with respect to the way that sort of the fundamental right to vote applies to non-residents. You know, the court, I think, its analysis in that case is very clear with respect to the fact that heightened scrutiny, you know, it basically says, does heightened scrutiny apply here? And then it says, well, we have to look at what the core of the vote is. It then distinguishes many of the cases that plaintiffs rely on precisely because they all involve the core right to vote of residents in a jurisdiction in which they reside. Then it says, stripped of its voting attire, you know, we therefore have to evaluate this case under rational basis review, even though it might in some way seem to implicate a right to vote. So to the extent the court has any concerns about the proper standard of review, I would direct the court to that case. All right, thank you very much. We'll next hear from Ms. Castro. May it please the court, Patricia Castro, here on behalf of the two state of Illinois local election authorities, Karen Kinney, who is sued in her official capacity as a chairwoman, Maricel Hernandez. What we have here— Do you know anything about the rules in the other states vis-a-vis absentee ballot voting in the territories? How unique is Illinois, or is it unique at all? I'm not aware of that, Your Honor, but I would suspect that Illinois is very likely not unique in that way. What this case is really about is what the Illinois Constitution requires as a legitimate right to require permanent residency in the state in order to vote in the state. Now, that classification on the basis of residency is subject to rational basis review, as the it's a legitimate interest with respect to— This case, we have to remember—I'm going to remind the court that the plaintiffs in this case are all former residents of Illinois who have taken up residency in another location, whether that be another state, whether that be a territory. All ties with Illinois have since ceded to exist. So, from that respect, there is nothing to tie them back to the state of Illinois, and there's nothing for the state of Illinois to be able to extend to them. Well, are there any limits on absentee voting outside of the territory of the United States? Let's say, would a person living in France who left as an infant and hasn't returned, would that person maintain the right to vote by way of absentee ballot in Illinois? I don't believe they would, Your Honor, but I don't have the answer to that. Let's say they left at the age of 18. Do you have any idea? They might very well be able—if they can show a nexus to Illinois. Again, we have to have a nexus as long as they don't have—they've not—well, first of all, France would be treated as a foreign nation. So, yes, if you can show that they are there on a temporary basis, if Illinois can ascertain that there is an intent to return to the state, then yes, possibly the right to absentee vote—the privilege of absentee voting may be extended to them. Again, I don't—it's the state's position that there is no right to absentee voting. It's a state's—more of a state's rights issue, if you would, and it's tied to residency and an intent to return to the state of Illinois, and the state of Illinois has that right to do so under the Constitution as well as under Congress—or subject to the Congress plenary power and a supremacy clause. So what we have here, again—and plaintiffs acknowledge that there is no constitutional right to vote in this state. It's not recognized. We vote for electors. Isn't there a fundamental kind of problem here, though, where we basically—I think to decide this case, short of a judicial grant, which would be extraordinary, of voting rights to residents—of all residents of U.S. territories. Short of that, we have to live with some forms of discrimination here. You all have—you and the U.S. government have been critical of the relief plaintiffs seek because it would wind up differentiating between lifelong residents of the territories and those who come from the mainland. You're asking us to tolerate long-term discrimination between those who move from mainland states, in essence, to overseas countries who are able to continue vote in the United States, and those who move to U.S. territories. And it's difficult to see at least a compelling reason why that distinction should be drawn. Correct. And again, these are voluntary acts by these citizens to move to these locations. In other words, there's nothing about the Illinois statute that is causing them this harm. It is— Right, but the same can be said of somebody who moves to Great Britain, right? Sure, sure. I suppose so. However, as Judge Rovner indicated, someone who is a former felon has a right to vote in Illinois. However, if they move to one of those states that does not allow former felons to vote, it's not anything—the harm caused to them does not relate back to the state of Illinois. And so, by the same logic, it's our position that this is not something traceable to the states. It's an action solely— I'm having trouble following your logic on the law, right? Right. Somebody who moves to the United Kingdom, presumably unless they become a citizen or subject of the United Kingdom, cannot vote in the United Kingdom, but they can continue to vote in Illinois and U.S. elections, right? As a matter of Illinois and U.S. law. And maybe that was—yeah, I didn't explain that correctly. What I'm basically saying, Your Honor, is that former residents, former Illinois residents who move outside of Illinois don't have the constitutional right to take their Illinois voting rights and privileges with them. Unless we have an act of Congress that directs the states to do so, we believe the remedy that the plaintiffs are seeking in this case would, in fact, require that, and not any action on behalf of the state of Illinois. The state of Illinois, all statutes and all laws, as the Court indicated, have to draw the line somewhere. Is this the type of law that rises to that fundamental rights violation? We would argue that it doesn't. We would argue that Illinois has a legitimate basis to draw that line by requiring permanent residency in its state. That is not something that the states have a right to control their elections, and that's what the state of Illinois has done. Congress has granted them that right, and we respectfully request that the Court affirm the District Court's finding that there is no suspect class—we're talking about former residents—and that the appropriate standard of review was rational basis. Thank you. Okay, thank you, Ms. Castro. Mr. Wyatt, rebuttal? Thank you, Your Honor. Let me just start out putting this in lay terms. This is a weird law, however we describe it. And what the Supreme Court actually instructs us on this issue, in Romer v. Evans, it says, discriminations of an unusual character merit careful consideration. And I have not heard an explanation from the other side for the plenty of sort of speculative reasons, which I'll go through in a minute, which I don't think stand up under any level of review. But we should look, whatever the standard of review is, and ask ourselves and convince ourselves that there is some reason here, because if it's an arbitrary discrimination, it does not stand up under any level of review. Why wouldn't the—I suggested a moment ago that, in essence, we have to choose between either judicially extending the franchise to all residents of U.S. territories, or we have to live with some arbitrary distinctions? Well, Your Honor, I think the way that that can be rationalized, I don't think it has to extend all the way to everybody in the territories. I mean, someday—Without drawing similarly arbitrary lines. Without drawing similarly arbitrary lines. Here the issue is, it actually gets back to the constitutional arguments that the defendants have been trying to make. There's no right to vote in the territories in the Constitution. That actually helps on this point, even though it doesn't hurt us, we think, on our core point, which is, it does delegate the right to vote, or to be represented, to the states. These laws extend that right, the right to representation in Congress by the states, within the states, to people residing elsewhere, wherever they may have moved. In this case, foreign countries, or American Samoa, or the Northern Mariana Islands, just not these three territories. So there is a constitutional basis, and a sound and explicit constitutional basis, to draw that line. Does it still produce this distinction of questionable fairness, as they call it? Yes. But that's the part that's inherent in the constitutional structure. It is not required by the Constitution. Could you quickly sketch for us the statutory history you were talking—legislative history—you were talking about, with respect to a remedy? With respect to? Why you think a remedy should be expansion rather than contraction. Yes, Your Honor. The 1975 Act, the federal 1975 Act, called the Overseas Citizen Voting Rights Act, is the predecessor to UOCAVA. UOCAVA expressly intended to streamline and update that law, not really change it substantively. That law has a legislative history, a House report, that says our purpose here is to extend the vote. It noted that some states had extended the vote to people residing overseas, chiefly government employees and military personnel, under a presumption that they would one day return to the state of residence. What Congress says is, who cares if they're returning? Let's just extend this to everybody who moves overseas. So we should look at the 1975 Act? Correct. Thank you very much. Yes, Your Honor. Is there anything else? Your Honor, I would just point out that there are— Very briefly. Very briefly. Oh, I'm sorry. I see my time has expired. There are practical considerations, though. These people have needs. They're being targeted by North Korea and Guam. They've been hit by a hurricane in the islands. They need representation of the federal government. Thank you. Thank you, Mr. Wyatt. Thank you all. To all counsel, the case is taken under advisement.